UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 19-24838-CIV-GOODMAN
[CONSENT CASE]

VOLKSWAGEN GROUP OF
AMERICA, INC., et al.,

      Plaintiffs,

v.

ANDY VARONA, et al.,

      Defendants.

_____/

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

These findings of fact and conclusions of law follow a bench trial between Plaintiffs Volkswagen Group of America, Inc. and Audi AG and Defendants Andy Varona and Verotec Wheels, Inc. Volkswagen Group of America, Inc. and Audi AG are referred to as "Audi."

## I.      Introduction and Background

This case is about Defendants' advertising, offering for sale, and selling of counterfeit Audi wheel sets on eBay, thereby infringing on Audi's trademark and design patent rights. Before the bench trial, the Court granted summary judgment in favor of Plaintiffs, finding Defendants liable for trademark infringement, trademark counterfeiting, trademark dilution, false designation of origin, and design patent

infringement of the claimed design of Audi's United States Design Patent No. D721,028 S (the "'028 patent"). The Court had fully determined the liability issues in favor of Plaintiffs and against Defendants on all claims. Thus, the central issue to be resolved at the bench trial was the proper amount of damages Plaintiffs are entitled to recover for Defendants' trademark infringement, counterfeiting, and patent infringement.

The summary judgment order granted in part and denied in part Plaintiffs' summary judgment motion. The Court awarded Plaintiffs $1,577.99 -- the cost of the one wheel set which Plaintiff's investigator purchased from the corporate defendant, Verotec.

The Court further outlined the issues remaining for a bench trial. Specifically, (1) whether Plaintiffs were entitled to recover statutory damages because of Defendants infringement and whether such damages could be extended to sales made beyond the one specific set of wheels Defendants sold to Plaintiffs' investigator; (2) whether this is an exceptional case within the meaning of the statute (to entitle Plaintiffs to recover attorneys' fees and costs pursuant to 15 U.S.C. § 1117(a)); and (3) whether Defendant Varona is personally liable for acts attributed to his company, Verotec.

In granting summary judgment in favor of Plaintiffs, the Court denied the right to statutory damages and capped Plaintiff's recovery at $1,577.99 as Defendants' gross profits from the one set of wheels purchased by Plaintiffs' investigator -- with the caveat that Plaintiffs *might* be entitled to additional damages on proof that establishes other sales made by Defendants were in violation of their United States Design Patent No. D721,028

S.

The Parties jointly filed their Joint Pretrial Stipulation. [ECF No. 83].

Paragraph V of the Uncontested Facts provides that "Defendants' advertisement and sale of Audi counterfeit wheel sets constitutes **willful** trademark infringement, as detailed in Count I of Plaintiff's complaint." *Id.* (emphasis added).

Paragraph Y of the Uncontested Facts says that "Defendants **willfully** infringed Audi's '028 patent, as detailed in Count IV of Plaintiff's complaint." *Id.* (emphasis added).

Paragraph B of the Trial Issues of Facts says that one factual issue is "whether Defendants' **willful** trademark infringement and counterfeiting results in trebled damages for the trademark claims . . ." *Id.* (emphasis added).

Paragraph 1 of Issues of Law to be Determined by the Court says that a legal issue is "the proper amount of statutory damages Plaintiffs are entitled to recover pursuant to 15 U.S.C. § 1117(c) for a result of Defendant's trademark infringement and counterfeiting." *Id.* [It should be noted that the word "willful" is *not* present].

But Paragraph 2 of the Issues of Law identifies as a legal issue "[w]hether Plaintiffs are entitled to recover attorney's fees and costs as a result of Defendants' **willful** trademark infringement and counterfeiting. . ." *Id.* (emphasis added).

The notion that Defendants' conduct was **willful** also appears twice in Plaintiffs' Statement of the Case:

As the Court has fully determined the liability issues in this case in favor of Plaintiffs and against Defendants, the central issue remaining for the Court

3

to resolve is the proper amount of damages Plaintiffs are entitled to recover
for Defendants' **willful** trademark infringement, counterfeiting, and patent
infringement.

. . .

The Court must also determine whether Plaintiffs are entitled to recover
attorneys' fees, and Plaintiffs contend they are entitled to recovery of such
fees due to Defendants' **willful** infringement and litigation misconduct.

*Id.* at pp. 1-2.

After the bench trial ended, Defendants filed a motion for a new trial [ECF No. 90],

arguing that their stipulation regarding willfulness was not knowingly entered into and

contending that Plaintiffs' counsel somehow tricked defense counsel by "slip[ping] by"

the willfulness language which defense counsel approved [ECF No. 94, p. 2]. The

Undersigned denied the new trial motion for myriad reasons. [ECF No. 101].

The Court held a bench trial on February 22, 2021. This Order (i.e., the findings of

fact and conclusions of law) will outline the facts in considerable detail and will analyze

the applicable legal doctrines. For purposes of providing a summary of the result now,

however, the most-salient results are listed below:

There is no dispute that Defendants infringed and counterfeited Plaintiffs'

registered Audi Trademarks, which are of extremely high value to Plaintiffs, as Audi has

built a globallyrecognized reputation through the marks and expends considerable costs

to protect its brand. Defendants knowingly sold counterfeit goods bearing Audi's word

trademark and world-famous AUDI RINGS® trademark in order to capitalize on Audi's

reputation as a high-end manufacturer of automobiles and automotive parts. Likewise,

there is no dispute that Defendants infringed Audi's '028 design patent.

Plaintiffs are entitled to recover damages for Defendants' willful infringement and counterfeiting. Plaintiffs seek an award of statutory damages under 15 U.S.C. § 1117(c).

Under the Lanham Act, the trademark holder may elect to recover either actual or statutory damages if the infringer is found liable for trademark infringement and counterfeiting. 15 U.S.C. § 1117(c). Statutory damages are particularly appropriate here -- as opposed to actual damages -- because Defendants failed to produce any records of sales or revenue data in response to Plaintiffs' discovery requests, and repeatedly denied such records exist. Without such records, it is impossible to calculate actual damages to compensate Plaintiffs for Defendants' willful infringement and counterfeiting.

Additionally, the statutory damages award must be sufficient to deter Defendants and others from continuing to counterfeit or otherwise infringe Plaintiffs' trademarks, to compensate Plaintiffs, and to punish Defendants, which are all stated goals of 15 U.S.C. § 1117(c). Plaintiffs also seek to recover damages for Defendants' willful patent infringement under 35 U.S.C. § 289, and to recover attorneys' fees and costs pursuant to 15 U.S.C. § 1117.

After performing a detailed analysis of the record evidence and relevant case law, the Court determines that Plaintiffs have established that they are entitled to an award of statutory damages for Defendants' willful trademark infringement and counterfeiting in the amount of $609,227.10, per 15 U.S.C. § 1117(c). The Court further determines that

Plaintiffs are entitled to recover damages for Defendants' willful infringement of the '028 patent in the amount of $40,615.14, per 35 U.S.C. § 289.

The Court finds that Plaintiffs are entitled to recover reasonable attorneys' fees and costs due to Defendants' willful infringement, counterfeiting, and litigation misconduct in an amount to be agreed upon or in an amount which the Undersigned will determine, pursuant to 15 U.S.C. § 1117(a).

Finally, the Court determines that individual Defendant Varona is also responsible for the judgment which will be entered against the corporate entity, Verotec Wheels, Inc.

## II.     Findings of Fact

### a.     The Parties

1.     Plaintiff Audi AG is a world-famous automobile manufacturer that sells Audi automobiles and genuine parts and accessories through a network of licensed Audi dealerships. In addition to the physical car lots operated by its licensees, Audi also operates various websites, including without limitation parts.audiusa.com, through which consumers can purchase genuine Audi parts, Audi wheels, automotive accessories, and Audi-branded merchandise directly from Audi or its dealerships. Under agreement with Audi, Plaintiff Volkswagen Group of America, Inc. ("VWGoA") polices and enforces Audi's trademarks in the United States. (JPS at 3-4, ¶ A).[1]

---

[1]     Uncontested and stipulated facts from the Joint Pretrial Stipulation are referred to as "JPS at __", found at ECF No. 83.

2.      Defendant Andy Varona (aka Hector Andy Varona and Hector DeVarona) is an individual residing in Miami, Florida. [JPS at p. 8, ¶ S].

3.      Defendant Verotec Wheels, Inc. is a Florida corporation with its principal place of business at 6619 South Dixie Highway #243, Miami, Florida 33143. Defendant Andy Varona is the sole owner, officer, and employee of Verotec Wheels, Inc. [JPS at p. 8, ¶ T].

4.      Defendants advertise, offer for sale, and have sold counterfeit goods bearing Audi's Trademarks using the eBay store oemwheelsdirect, including counterfeit wheel sets bearing Audi's world-famous trademarks. [JPS at p. 4, ¶ B].

    b.   The Underlying Facts

1.      Audi's world-famous and distinctive trademarks symbolize the Audi brand and its marketability, reputation, and goodwill. Audi first registered AUDI® as a trademark with the United States Patent and Trademark Office (or "USPTO") in 1960 (U.S. Reg. No. 0,708,352) and has subsequently obtained numerous other registrations for that mark. Audi first registered the AUDI RINGS® trademark with the USPTO in 1971 (U.S. Reg. No. 0,906,525) and has also obtained numerous other registrations for that mark. [ECF No. 41, ¶ 16]. True and correct "status" copies of the Audi Trademark registrations, obtained from the Trademark Status Document Retrieval (TSDR) database of the United States Patent and Trademark Office, are attached to the Verified Amended Complaint as Exhibit 2. [ECF No. 41-2]. Audi's registrations for the Audi Trademarks are

valid, unrevoked, subsisting, and many are incontestable. [JPS at pp. 3-4, ¶ A].

2.      Audi has spent hundreds of millions of dollars and has expended significant effort in advertising, promoting, and developing the Audi Trademarks throughout the world. As a result of such advertising and expenditures, Audi has established considerable goodwill in its trademarks. The distinctive Audi Trademarks have become widely known and recognized throughout the world as a symbol of high-quality automotive goods and services. The goodwill associated with the Audi Trademarks is of incalculable and inestimable value to Audi. [JPS, p. 4, ¶ B].

3.      To protect the Audi Trademarks, Audi spends considerable time, money, and resources combatting trademark infringement and counterfeiters. [Trial Tr., pp. 21:23-23:6, 23:7-13, 24:10-22].[2]

4.      As a premium automotive manufacturer, "[Audi's] reputation is everything." When consumers buy Audi products, designated by the AUDI RINGS® trademark, they have a certain level of expectation given Audi's reputation for the high-quality and safe products which Audi has developed and manufactured. [Trial Tr., pp. 24:25-25:16].

5.      Wheels are a structural component of an automobile. Genuine Audi wheels are subjected to strict internal testing and governmental regulations to ensure that they

---

[2] The transcript from the Feb. 22, 2021 Bench Trial is referred to as "Trial Tr. __" and is found at ECF No. 93.

are high quality and perform in a safe manner for consumers using the wheels on the road. These standards include ensuring the structural integrity of the products and that they meet national safety standards for use under various driving conditions (i.e., higher speeds, low and high temperatures, and varying road surfaces). [Trial Tr., p. 32:9-20]; [ECF No. 66-14, ¶¶ 7, 8].

6.      Counterfeit wheels are not subject to the same testing or ensured to meet the same Audi and governmental standards as genuine Audi wheels. Therefore, the introduction of untested and unregulated counterfeit wheel sets into the marketplace poses a threat of substantial harm to public safety. Audi has seen safety issues with infringing and counterfeit products masquerading as genuine by using the AUDI® trademark, further contributing to the efforts Audi invests in policing the market for counterfeit products. For example, Audi's Manager for Genuine Parts testified at trial that he had reviewed photos of a counterfeit wheel set bearing the Audi Trademarks that collapsed under the pressure of the car during normal operation. [Trial Tr., pp. 35:8-36:2].

7.      As another example of potential safety issues posed by the counterfeit wheel set purchased by Plaintiffs' investigator in this case, Audi's Manager for Genuine Parts testified that upon physical inspection, that the non-genuine wheel cap had a looser fit. [Trial Tr., pp. 40:24-41:7]. He further testified that a potential consequence of the counterfeit wheel cap's improper fit, is that "it could become detached while you're driving." *Id.* at p. 41:8-11.

8.      Consumers purchasing counterfeit products that they expect to be genuine Audi products -- as designated by the Audi Trademarks -- have an expectation that they are buying a high-quality product manufactured by Audi. However, counterfeit products are not subjected to the same rigorous testing and standards as Audi's genuine products. When counterfeit products fail to live up to the high standards set by Audi that consumers expect, that reputational harm will adversely affect Audi. As a result, customers will attribute the low-quality counterfeit goods to Audi, causing reputational harm to Audi and a potential loss in future sales. [Trial Tr., pp. 23:23-24:9, 25:2-12].

9.      Defendants advertise and sell counterfeit Audi wheel sets, which they advertise as being "brand new" and "OEM" on the Internet via eBay using the eBay seller ID "oemwheelsdirect." [JPS, p. 4, ¶ D].

10.     Defendants use advertising keywords in their eBay listings such as "brand new," "made in Germany," and "OEM" ("original equipment manufacturer"). eBay has a specific "search manipulation policy" banning the use of keywords. The title of the counterfeit wheel set purchased by Plaintiffs' investigator in this case contained multiple misleading keywords: "20 AUDI RS 2017-19 WHEELS RIMS NEW OEM RS5 A5 A6 A7 A8 MADE IN GERMANY." [JPS, p. 4, ¶ C].

11.     Defendants have posted several advertising images on the Internet depicting the unauthorized, counterfeit Audi wheel sets, which incorporate and display the Audi Trademarks, both on the goods and in advertising language using keywords.

[JPS, p. 5, ¶ E].

12.    Defendants registered the eBay seller ID "oemwheelsdirect," through which Defendants advertise, offer for sale, and sell counterfeit goods bearing Audi's world-famous Trademarks, including the AUDI RINGS® trademarks and AUDI® Trademarks. [JPS, p. 5, ¶ F].

13.    Defendants registered the PayPal account No. 2145988751537780935 linked to eBay seller ID "oemwheelsdirect" using the email address "verotecwheels2016@outlook.com," ("Defendants' PayPal Account") to receive funds for the sale of goods on eBay, including counterfeit goods bearing Audi's world-famous Trademarks. [JPS, p. 5, ¶ G].

14.    Defendants' PayPal Account was registered on July 26, 2016 by Defendants. The registrant and operator information for Defendants' PayPal Account match the last four digits of Defendant Andy Varona's social security number (7501), Defendant Verotec Wheels, Inc.'s tax ID number (EIN), and Defendants' former and present addresses. The account is registered under the name Hector Jude Varona, which is the former legal name of Defendant Andy Varona. Defendant Andy Varona testified that he registered and operates Defendants' PayPal Account using the name Hector Jude Varona. [JPS, p. 5, ¶ H].

15.    Defendants' PayPal Account is linked to bank accounts and credit cards that only Defendant Andy Varona has access to, through which he receives funds for

items sold on the eBay store "oemwheelsdirect," including funds for the sales of counterfeit wheel sets bearing the Audi Trademarks, including the AUDI RINGS® trademarks and AUDI® trademarks. [JPS, p. 5, ¶ I].

16.     Defendants have received at least $5,048,690.83 for items sold on their eBay store "oemwheelsdirect" from July 26, 2016 until June 22, 2020. Sales data provided by PayPal in response to Plaintiffs' third-party discovery requests was limited to sales from June 5, 2018 to June 22, 2020 due to PayPal's record-keeping policy. [JPS, pp. 5-6, ¶ J].

17.     Defendants offered for sale an "Audi" wheel set on the oemwheelsdirect eBay store, which included photographs of what appeared to be an Audi wheel set. Specifically, oemwheelsdirect included an advertisement on eBay for "20 AUDI RS 2017-19 WHEELS RIMS NEW OEM RS5 A5 A6 A7 A8 MADE IN GERMANY." Plaintiffs' investigator purchased the wheel set, and it was shipped to Plaintiffs' investigator. The return shipping label (containing Defendants' address) and the wheel set were photographed by the investigator upon receipt. The wheel cap contained the Audi trademarked rings, and the wheels were identical in design to an Audi wheel set. [JPS, p. 6, ¶ K].

18.     The internet and online marketplaces -- including eBay -- have led to a proliferation of trademark infringement and counterfeiting cases that Audi has had to expend great resources to combat because they have made it "infinitely easier" for counterfeiters to market and sell counterfeit goods relatively easily compared to years

ago. [Trial Tr. pp. 26:11-17, 20-25, 27:2-11].

19.     Plaintiffs sole witness at trial, Russell Trowbridge, the Manager for Audi Genuine Parts, testified on direct and on cross-examination that while he did a visual inspection of the wheels sold to Plaintiffs' investigator, he did no testing on them.  [Trial. Tr., pp. 29:10 -20, 42:8-17].

20.     Mr. Trowbridge further testified that he did physically inspect the center caps sold with the wheels and determined them to be counterfeit. [Trial Tr., p. 40:11-13].

21.     Mr. Trowbridge acknowledged that he does no "technical testing, like crash testing and [the] sort, for counterfeit goods beyond visual inspection." [Trial Tr., pp. 32:4-6, 33:16, 38:10-14].

22.     Other than the one set of rims purchased by Plaintiffs' investigator from Defendants, Mr. Trowbridge never saw, inspected, or tested, any other products sold by the Defendants for any reason. [Trial Tr., pp. 42:8-25, 43:1-3].

23.     Other than a visual inspection and side-by-side comparison with genuine Audi wheels, no safety testing was done on either the wheels or wheel caps sold to Plaintiffs' investigator or any wheels listed for sale by Verotec.

24.     Audi inspected the wheel set and confirmed that it was counterfeit and not manufactured by Audi. [JPS, p. 6, ¶ K]; [Trial Tr., pp. 28:8-29:2]; [ECF No. 66-14, ¶¶ 5, 6 (Decl. of Trowbridge)].

| Audi Trademark<br>U.S. Reg. No. 3,201,037 | Infringing and Counterfeit<br>Product |
|---|---|
|  |  |

25.     As shown above, Defendants' infringing and counterfeit wheel product that was advertised, offered for sale, and sold via the eBay store "oemwheelsdirect" bears the world-famous Audi Trademarks, including, but not limited to, the AUDI RINGS® mark. [ECF No. 41, p. 7, ¶ 29].

26.     Plaintiffs have shown that Plaintiffs' valid mark was used in commerce by Defendants without Plaintiffs' consent. Plaintiffs have provided proof of a likelihood of confusion and that the wheel sets sold by Defendants are counterfeits of Audi's genuine products. Defendants advertised and sold a wheel set with a center cap mark that is identical to Plaintiffs' mark, the wheel set included the same design as the Audi '028 patent design (as discussed further below), and Defendants advertised the wheel sets as "Audi," "factory," and "OEM." Additionally, it is undisputed that Plaintiffs' mark is strong, Defendants' sale of wheel sets competes with the sale of genuine Audi wheel sets as they both target consumers seeking to buy genuine Audi goods via the Internet, and Defendants' intent can be inferred from the identical copying of the Audi mark and

design patent and advertising. Moreover, Defendants advertised and sold a wheel set that is a counterfeit of Audi's genuine products. [JPS, p. 6, ¶ L).

27.     Defendants advertised an "Audi" wheel set that contained a mark identical to Audi's four-ring mark on the center cap and sold the counterfeit wheels to Plaintiffs' investigator using the subject oemwheelsdirect eBay store. [JPS, p. 6, ¶ M].

28.     The subject oemwheelsdirect eBay store listing did not simply state that the wheel set would *fit* Audi vehicles; it advertised new "OEM" Audi wheel rims and included photographs of what appeared to be an Audi wheel set, with the Audi mark in the center cap. [JPS, p. 7, ¶ N].

29.     Plaintiffs have undisputed and enforceable trademark rights in the marks at issue, and Defendants were not authorized at any time to use Plaintiffs' marks. [JPS, p. 7, ¶ O].

30.     In response to Plaintiffs' discovery requests, Defendants repeatedly claimed that they were not in possession of any sales data for Audi wheel sets advertised and/or sold on the oemwheelsdirect eBay store. Defendant Andy Varona testified, in his personal capacity and on behalf of Verotec Wheels, Inc., that no sales records for items sold by Defendants on the oemwheelsdirect eBay store were in Defendants' possession, custody, or control. [JPS, p. 7, ¶ P].

31.     Due to Defendants' lack of any financial records, as they represented under oath, Plaintiffs sought and obtained discovery from eBay and PayPal. The records are

incomplete as they only cover the time period June 5, 2018 through June 22, 2020 (and Defendants' operations began on July 26, 2016). [JPS, p. 7, ¶ Q].

32.     Defendants continue to operate the oemwheelsdirect eBay store. An action remains pending in Miami-Dade County Court against Defendants, alleging violation of the Florida Deceptive and Unfair Trade Practices Act and fraud for selling counterfeit Range Rover wheels. [JPS, p. 7, ¶ Q].

33.     PayPal records reflect 27 sales associated with the email verotecwheels2016@outlook.com, which include item titles describing "Audi" wheel rims. These items reflect a gross profit of $40,615.14. This number of sales represents the minimum amount of Defendants' gross profit for infringing sales of counterfeit Audi wheel sets. [JPS, pp. 7-8, ¶ R].

34.     Defendants' PayPal Account is linked to bank accounts and credit cards that only Defendant Andy Varona has access to, through which he receives funds for items sold on the eBay store "oemwheelsdirect," including funds for the sales of counterfeit wheel sets bearing the Audi Trademarks, including the AUDI RINGS® trademarks and AUDI® trademarks. [ECF No. 66-5, pp. 97:5-99:11 (Varona Dep. Tr.)].

35.     Defendant Andy Varona is the only individual with access to the bank account registered to Verotec Wheels, Inc., the same bank account which receives proceeds generated by Defendants on the eBay store oemwheelsdirect. *Id.* at pp. 54:12-24. Defendant Andy Varona's personal social security number is associated with the PayPal

account linked to the oemwheelsdirect PayPal account. *Id.* at 92:19-21. Defendants, or others working at their direction, engaged in the infringing activities at issue in this case, including providing the item descriptions for the counterfeit products at issue. [JPS, p. 8, ¶ U].

36.     Defendants have falsely and repeatedly denied being involved in the advertising and sales of the infringing counterfeit Audi-branded wheel sets at issue in this case -- despite overwhelming evidence to the contrary. [ECF No. 81, p. 8, n. 2]. This includes Defendants denying owning and operating the oemwheelsdirect eBay account from the outset of the case, in discovery responses, and even in Defendants' failed opposition and sham affidavit filed in response to Plaintiffs' motion for summary judgment.

37.     In the opposition to the summary judgment motion, Defendant Andy Varona claimed that "any ownership of or interest in any online store bearing that name does not belong to me," and "Defendants do not have an eBay account." [ECF No. 70-1, ¶¶ 4-5]. However, Mr. Varona testified during his deposition that he (through his corporation Verotec Wheels) sells "[c]ars, wheels, tires, racing cars, and some automotive racing equipment" that he purchases from distributors on eBay through his username "OEM Wheels Direct." [ECF Nos. 66-5, pp. 8-9; 1-4, p. 2; 66-5, p. 29 (deposition testimony from Varona stating that his CPA filed an application for the registration of fictitious name "OEM Wheels Direct" to be in compliance with eBay's requirement that user names

be registered as fictitious names), p. 38 ("[T]his [i]s the PayPal account where you received money for the goods you sold on eBay under the user name OEM Wheels Direct? A. Correct.")]; [JPS, pp. 8-9, ¶ V].

38.    Defendants have made numerous false statements under oath, including denying using any trademarks belonging to Audi [ECF No. 71, ¶ 9], and stating that "[t]he Defendants do not sell counterfeit Audi wheels" [ECF No. 70-1, ¶ 6]. Defendant Varona's sham affidavit filed with Defendants' summary judgment opposition does nothing to rebut the overwhelming evidence provided by Plaintiffs proving that Varona/Verotec Wheels sold counterfeit Audi wheel sets on eBay. [JPS, p. 9, ¶ V].

39.    On January 25, 2021, the Court granted summary judgment in favor of Plaintiffs, finding Defendants liable for trademark infringement, trademark counterfeiting, trademark dilution, false designation of origin, and design patent infringement of the claimed design of Audi's United States Design Patent No. D721,028 S (the "'028 patent"). [ECF No. 81, p. 35].

40.    The Court also enjoined Defendants from using any products, packaging, or advertising of AUDI RINGS®, and any other Audi Trademarks; and from the use of any Audi word mark. Defendants were also enjoined from making, using, selling, offering to sell, or importing products that infringe the claimed design of the '028 patent. *Id.* at 31-32.

41.    The parties have stipulated that Defendants' advertisement and sale of

Audi counterfeit wheel sets constitutes **willful** trademark infringement and counterfeiting, as detailed in Count I of Plaintiffs' Verified Amended Complaint. [JPS, p. 9, ¶ V].

42.     The parties have stipulated that Defendants made unauthorized use of Audi's enforceable trademark rights in the AUDI RINGS® trademarks and AUDI trademarks®, such that consumers were likely to confuse the two. Therefore, Defendants are liable under Count II, false designation of origin. [JPS, pp. 9-10, ¶ W].

43.     The parties have stipulated that the Audi Trademarks are famous and distinctive; Defendants used the trademarks after the marks become famous; and Defendants' use of the marks was commercial and in commerce, as Defendants offered the counterfeit wheel set for sale and actually sold one to Plaintiffs' investigator. Defendants' use of identical trademarks on products identical to those sold by Audi is likely to dilute the strength of the Audi Trademarks because consumers cannot rely on Audi's Trademarks to indicate that Audi is the source of goods bearing these marks. Thus, Defendants are liable under Count III for trademark dilution. [JPS, p. 10, ¶ X].

| U.S. Design Patent D721,028 S | Infringing and Counterfeit Product |
|---|---|
|  | |

44.     The parties have stipulated that Defendants **willfully** infringed Audi's '028 patent, as detailed in Count IV of Plaintiffs' Verified Amended Complaint. The '028 patent is an ornamental design for a front face of a vehicle wheel. As shown above, a side-by-side comparison reflects that the design of the counterfeit wheel sold by Defendants to Plaintiffs' investigator is the same, or substantially the same, as the design of the '028 patent. An ordinary observer would be deceived and could be induced to purchase Defendants' counterfeit wheel sold over Plaintiffs' genuine wheels. [JPS, p. 10, ¶ Y].

**III.    Conclusions of Law**

a. <u>Plaintiffs are Entitled to Recover Statutory Damages for Defendants' Willful Trademark Infringement and Counterfeiting</u>

Under the Lanham Act, Plaintiffs are entitled to elect to recover either actual or statutory damages for Defendants' trademark infringement and counterfeiting. 15 U.S.C. § 1117(c). Statutory damages were implemented by Congress because "counterfeit records are frequently nonexistent, inadequate, or deceptively kept making proving

20

actual damages in these cases extremely difficult if not impossible." *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1219-20 (S.D. Fla. 2004) (citing *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 852 (11th Cir. 1990) for the proposition that "district courts have wide discretion in awarding statutory damages").

"An award of statutory damages is appropriate despite a plaintiff's inability to prove actual damages caused by a defendant's infringement." *Tiffany (NJ) LLC v. Benefitfortiffany.com*, No. 16-60829-CIV, 2016 WL 8679081, at *7 (S.D. Fla. Nov. 3, 2016) (citing *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 852 (E.D. Mich. 2006) ("[A] successful plaintiff in a trademark infringement case is entitled to recover enhanced statutory damages even where its actual damages are nominal or non-existent")), *report and recommendation adopted*, 2016 WL 8678880 (S.D. Fla. Dec. 20, 2016). Indeed, Congress enacted a statutory damages remedy in trademark counterfeiting cases because evidence of a defendant's profits in such cases is almost impossible to ascertain. *See, e.g.*, S. Rep. No. 104-177, at 10 (1995) (discussing purposes of Lanham Act statutory damages).

Here, Plaintiffs are entitled to recover statutory damages under 15 U.S.C. § 1117(c) for Defendants' willful trademark infringement and counterfeiting of up to $2,000,000 per infringed mark. Statutory damages are particularly appropriate in this case because Defendants failed to produce any records of sales or revenue data in response to Plaintiffs' discovery requests and repeatedly denied such records existed. It is impossible to calculate actual damages without Defendants' sales records, as is the case here. The

parties stipulated to this effect in the Joint Pretrial Stipulation. [JPS, p. 7, ¶ P].

Likewise, Defendants themselves reiterated at trial that they had no sales records and have never produced any sales records to Plaintiffs. [Trial Tr. pp. 17:1-13, 90:3-21].

Despite Defendants' insistence about not having access to any of their own eBay and PayPal sales records, *Plaintiffs* sought to obtain sales records through third-party discovery of eBay and PayPal, which Defendants initially opposed. Although Defendants' counterfeiting venture began at least as early as 2016, the records obtained by third-party subpoena are limited to June 5, 2018 to June 22, 2020 due to PayPal's record-keeping policy. These third-party records provide only a listing of item titles without more. [JPS, pp. 7-8, ¶¶ Q-R].

Plaintiffs exhausted all efforts to obtain records from Defendants throughout the case but were unable to do so, and Defendants have repeatedly attested such records do not exist. Statutory damages are therefore the only viable method of recovery available to Plaintiffs for Defendants' willful infringement and counterfeiting.

### i. Plaintiffs' Statutory Damages Determination Under 15 U.S.C. § 1117

Trial courts have wide discretion when determining statutory damages under 15 U.S.C. § 1117(c). *Cable/Home Commc'n*, 902 F.2d at 852. The trademark damages statute -- 15 U.S.C. § 1117 -- provides little guidance to the appropriate amount. *Abercrombie & Fitch Trading Co. v. Importrade USA, Inc.*, No. 07-23212-CIV, 2009 WL 10668408, at *2 (S.D. Fla. Aug. 18, 2009). In calculating statutory damages in trademark counterfeiting cases, courts

in this District have looked to cases involving willful *copyright* infringement for guidance.

*See, e.g., Luxottica Grp. S.p.A. v. Casa Los Martinez Corp.*, No. 1:14-CV-22859-JAL, 2014 WL

4948632, at *4 (S.D. Fla. Oct. 2, 2014). In these cases, courts generally consider the

following factors:

> (1) the expenses saved and profits reaped; (2) the revenue lost by the
> plaintiff; (3) the value of the copyright [or trademark]; (4) the deterrent
> effect of others besides the defendant; (5) whether the defendant's conduct
> was innocent or willful; (6) whether a defendant cooperated in providing
> particular records from which to assess the value of the infringing material
> produced; and (7) the potential for discouraging the defendant.

*Id*. (citations omitted).

Courts also consider whether the counterfeit goods pose a risk to the public safety.

*See, e.g., Illinois Tool Works Inc. v. Hybrid Conversions, Inc.*, 817 F. Supp. 2d 1351, 1356 (N.D.

Ga. 2011) ("[I]mportantly, defendants marketed and sold counterfeit items that posed a

risk to public safety. . . . Therefore, the court finds that a large statutory damages amount

is appropriate.") The Court now addresses each factor in turn.

### 1. Defendants' Profits

Determining a defendant's profits in counterfeiting cases is often difficult or

impossible. *See PetMed Express*, 336 F. Supp. 2d at 1219. "Generally, statutory damages

[under the Lanham Act] are awarded when no actual damages are proven, or actual

damages and profits are difficult or impossible to calculate." *Cable/Home Commc'n*, 902

F.2d at 850. In assessing this factor, many courts have rejected the infringer's argument

that its actual profits were fairly low, or even where the infringer has lost money. *See, e.g.,*

*H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1047 (E.D. Wis. 2018) (awarding statutory damages of $300,000 per mark per type of counterfeit good, for a total statutory damages award of $19.2 million); *Diane Von Furstenberg Studio v. Snyder*, No. 1:06-CV-1356, 2007 WL 3143690, at *5 (E.D. Va. Oct. 23, 2007) (rejecting Defendant's argument that it "lost money on sales of plaintiff's dresses" or that her profits were "fairly low").

Here, Defendants stipulated that there were at least 27 infringing sales of infringing counterfeit Audi wheel sets displaying Audi's trademarks, resulting in an estimated gross profit to Defendants of $40,615.14. [JPS, pp. 7-8, ¶ R].

However, actual damages and profits are impossible to calculate based on the available evidence. The actual number of infringing sales may never be known due to Defendants' refusal to produce any sales records during discovery. [JPS, p. 7, ¶ P]. Moreover, any claims of low profits by Defendants are worth little weight in determining statutory damages because one of the principal purposes of statutory damages is to ensure that counterfeiters are deterred and punished. *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 588 (7th Cir. 1989).

Because Defendants produced no evidence of sales or profits and the only evidence available regarding Defendants' profits is incomplete and unreliable, this factor favors awarding a significant statutory damages award to Plaintiffs. *See Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 169 (S.D.N.Y. 1999) ("Courts are to resolve against the defendants any factual uncertainties, such as whether any portion of the

defendants' revenue may be deducted from damages, when the defendants left the uncertainty by not responding to the evidence of counterfeit sales with evidence of their own.").

### 2.   Revenue Lost by Plaintiffs and the Value of the Trademarks

Likewise, when considering the second and third factors, it is impossible to ascertain the exact amount of damage caused to Audi by Defendants' specific infringing conduct. Courts calculating statutory damages consider the value of the plaintiff's brand and its efforts to protect the brand. *H-D U.S.A.*, 311 F. Supp. 3d at 1047, 1049 (awarding $300,000 per mark). Where no specific information concerning the revenue defendants earned, or revenue lost by the plaintiff, is available, but the value of the trademarks is high, and deterrence favors substantial statutory damages, courts have awarded plaintiffs damages amounting to half of the permissible statutory range. *See, e.g., Lane Crawford LLC v. Kelex Trading (CA) Inc.*, No. 12 Civ. 9190, 2013 WL 6481354, at *4 (S.D.N.Y. Dec. 3, 2013) (awarding plaintiff $1,000,000, half the maximum statutory damages permissible for willful infringement). The higher the value of the trademark, the greater the likelihood that the infringement will harm the infringed party's reputation. *Snyder*, 2007 WL 3143690, at *5.

In addition, selling counterfeit goods via the Internet allows access to a "virtually limitless number of customers," which makes the reputational harm to the trademark holder impossible to quantify. *Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123, 125 (S.D.N.Y.

2003) (citations omitted); *see also Louis Vuitton Malletier, S.A. v. Mosseri*, No. 07-civ-2620, 2009 WL 3633882, at *3 (D.N.J. Oct. 28, 2009) (finding counterfeiting enterprise's use of the Internet "exponentially increased the damage done").

This Court has already found that Audi owns high-value trademarks. [JPS, p. 4, ¶ B]. Audi's trademarks are world-famous and "symbolize the Audi brand and its marketability, reputation, and goodwill." [JPS, pp. 3-4, ¶ A]. Audi's registered trademark AUDI® was registered in 1960, and its registered AUDI RINGS® trademark was registered in 1971. *Id.* Since that time, Audi has continuously used its trademarks for advertising, vehicles, and other goods in order to identify the source of its goods and services. [JPS, p. 4, ¶ B]. Audi spends hundreds of millions of dollars in producing goodwill in its trademarks through advertising and developing the trademarks across the globe. *Id.* These symbols are known around the world to be associated with Audi's high-quality luxury automobiles, automotive goods, and automotive services. *Id.*

In addition to the costs of developing its reputation, Audi expends large amounts of time and money to protect its trademark rights. [Trial Tr. pp. 21:14-24:22]. The amount of resources Audi spends protecting its brand is "not easily quantified." *Id.* at pp. 24:13-14. As such, there is a good argument that the damages award should be enhanced accordingly. *See Mosseri*, 2009 WL 3633882, at *3 ("[T]he fact that [] Defendant operated its counterfeit goods-trafficking enterprise on the Internet exponentially increased the damage done, both to [plaintiff]'s reputation and to the public interest in fair markets.").

### 3.   Deterrence and Discouragement

The fourth and seventh factors also support a substantial statutory damages award. Statutory damages under 15 U.S.C. § 1117(c) are not just to compensate the trademark holder but also to deter the defendant's wrongful conduct. *Chanel, Inc. v. Replicachanelbag*, 362 F. Supp. 3d 1256, 1265-66 (S.D. Fla. 2019) ("The award should be sufficient to deter Defendants and others from continuing to counterfeit or otherwise infringe Plaintiff's trademarks, compensate Plaintiff, and punish Defendants, all stated goals of 15 U.S.C. § 1117(c)."). "Awards of statutory damages serve two purposes—compensatory and punitive." *Audi AG v. Sun Am. Corp., Inc.*, No. 17-CV-62199, 2018 WL 7021842, at *2 (S.D. Fla. Dec. 18, 2018).

In addition to deterring Defendants from counterfeiting and infringement, the Court must also take into account the need to discourage other potential infringers. *See id.*; *see also Luxottica*, 2014 WL 4948632, at *5 ("Awarding statutory damages in this case will discourage other potential infringers from engaging in similar conduct."). If this Court were to award only nominal damages, Defendants, and others similarly situated, could merely factor this cost into their ongoing and future infringing activities. *Luxottica*, 2014 WL 4948632, at *5.

The Internet's creation of an unlimited outlet for trademark infringers and counterfeiters further supporting a damages award to avoid the proliferation of counterfeiting operations online. *Snyder*, 2007 WL 3143690, at *6. By selling over the

Internet, defendants have access to a "virtually limitless number of customers." *Rolex Watch U.S.A., Inc. v. Jones*, No. 99 Civ. 2359, 2002 WL 596354, at *5 (S.D.N.Y. Apr. 17, 2002); *see also Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 584 (E.D. Pa. 2002) ("While the record contains no evidence of the actual scope of the defendants' sales, nor the number of hits the internet site received, given the scope of the internet supermarket, such sale offerings are presumptively quite high . . ").

Here, there is a strong need to deter Defendants' wrongful conduct and discourage other potential infringers. Audi's corporate witness testified that internet marketplaces, such as eBay, have led to an increase in trademark infringement cases in recent years. [Trial Tr., pp. 27:4-11]. Moreover, it is undisputed that all infringing offers for sale and sales in this case took place via the Internet on Defendants' eBay store. [JPS, p. 6, ¶ K]. Given the scope of the internet market where Defendants offered counterfeit Audi wheel sets for sale, Defendants' infringing sales are presumptively quite high. *See Veit*, 211 F. Supp. 2d at 584.[3]

Accordingly, a significant statutory damages amount is necessary here to deter

---

[3]        Defendants have stipulated, and Defendant Andy Varona testified at trial, that more than $5,048,690.83 in proceeds flowed through Defendants' oemwheelsdirect eBay store between June 5, 2018 and June 22, 2020. [JPS, pp. 5-6, ¶ J]; [Trial Tr., p. 75:19-24]. Based on limited third-party discovery and publicly available information, the vast majority of Defendants' online sales are counterfeit wheels bearing the brand names and trademarks of Audi and other luxury automakers such as Porsche and Mercedes-Benz, which Defendants continue to operate to this day. As such, a large statutory damages award is justified to deter Defendants' **continued** infringing behavior.

Defendants' continued and future infringement, to deter potential future infringers, and to curb the proliferation of counterfeiting operations on online marketplaces such as eBay. *See Fendi S.r.l. v. Bag*, No. 19-CIV-61356-RAR, 2019 WL 4693677, at *5 (S.D. Fla. Aug. 28, 2019) (awarding statutory damages in the amount of $1,000,000 for each infringing Defendant under 15 U.S.C. 1117(c), finding "that this award of statutory damages falls within the permissible range under 15 U.S.C. section 1117(c) and is just") (collecting cases).

### 4.  Defendants' Willful Infringement

As to the fifth factor, courts consider whether the defendant's conduct was innocent or willful. Here, Defendants have stipulated that their advertisement and sale of Audi counterfeit wheel sets constitutes willful trademark infringement and counterfeiting, as detailed in Count I of Plaintiffs' Verified Amended Complaint. [JPS, p. 9, ¶ V]. Defendants' stipulation is a fact in the record and part of the trial record. "Factual stipulations are 'formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.'" *Anago Franchising, Inc. v. Shaz, LLC*, No. 10-62273-CIV, 2014 WL 11430924, at *2 (S.D. Fla. Apr. 9, 2014) (quoting *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 677 (2010)); *see also* S.D. Fla. L.R. 16.1(g) (the pretrial stipulation is a part of the trial record upon the conclusion of the pretrial conference).

In addition to Defendants' stipulation as to willful trademark infringement and

counterfeiting being part of the record evidence, the factual record contains examples of Defendants' willful conduct. "Conduct is willful if the infringer was knowingly and deliberately cashing in upon the goodwill of the infringed." *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1170 (11th Cir. 2019) (citation omitted); *see also Rain Bird Corp. v. Taylor*, 665 F. Supp. 2d 1258, 1268 (N.D. Fla. 2009) ("The only reasonable inference from these facts is that Taylor willfully infringed the Rain Bird Marks to profit from Rain Bird's longstanding reputation and goodwill.").

Defendants' counterfeiting operation clearly aimed to cash in upon the reputation and goodwill associated with the Audi Trademarks, which are of incalculable and inestimable value to Audi. [Trial Tr., pp. 23:23-24:9, 25:2-12]. The only reasonable inference from the facts in evidence is that Defendants willfully infringed and counterfeited the Audi Trademarks to profit from Audi's longstanding reputation and goodwill, further establishing Defendants' willful conduct. *See Rain Bird*, 665 F. Supp. 2d at 1268. Additionally, Defendants admitted to intentionally using misleading keywords such as "Audi," "authentic," "OEM," and "factory" in their eBay listings in order to capitalize on the goodwill developed and nurtured by Plaintiffs as a standard business practice, despite this practice being clearly against eBay policy. [JPS, p. 4, ¶ C]. This is further evidence of Defendants' willful behavior.

In sum, Defendants have stipulated to willful infringement and counterfeiting, a position which aligns with the facts in the record of the case. Accordingly, Plaintiffs are

entitled to enhanced damages for Defendants' willful trademark infringement and counterfeiting of up to $2,000,000 per counterfeit mark per type of good sold, offered for sale, or distributed. 15 U.S.C. § 1117(c)(2). Moreover, Defendants' willfulness supports trebling the statutory damages award to account for Defendants' willfulness. *See Abercrombie*, 2009 WL 10668408, at *2 (trebling statutory damages award for trademark infringement due to defendants' willfulness).

### 5. Defendants' Cooperation and Litigation Behavior

Regarding the sixth factor, "[c]ourts have noted 'the creation of this alternative to the more traditional damage remedies of recovery of the plaintiffs' damages or the defendant's profits reflected a harsh reality—counterfeiters often do not keep or secrete records of their unlawful activities, thus making proof of the extent of the plaintiff's injury or the counterfeiters' profits impossible as a practical matter.'" *Luxottica*, 2014 WL 4948632, at *5 (quoting *Sara Lee*, 36 F. Supp. 2d at 165).

Here, Defendants refused to produce any records concerning their sales during the discovery process. [JPS, p. 7, ¶ P]. At his deposition, Defendant Andy Varona testified, in his personal capacity and on behalf of Verotec Wheels, Inc., that no sales records for items sold by Defendants on the oemwheelsdirect eBay store were in Defendants' possession, custody, or control, nor did Defendants ever produce any sales records in

response to Plaintiffs' discovery requests. *Id.*[4]

Additionally, Defendants have been uncooperative and disingenuous with Plaintiffs and the Court throughout this case. From the beginning, Defendants falsely and repeatedly denied operating the oemwheelsdirect eBay website, under oath, at Mr. Varona's deposition and in Mr. Varona's sham declaration submitted to the Court at the summary judgment stage. [JPS, pp. 8-9, ¶ V]. Further, Defendants repeatedly refused to cooperate during discovery, submitting contradictory discovery responses and withholding discovery responses. *Id.* This forced Plaintiffs to vigorously oppose Defendants' misrepresentations in order to obtain certain discovery documents necessary for this case and to participate in unnecessary motion practice -- thereby increasing the time and money expended on this case. *Id.*

The Defendants' uncooperative actions and documented lack of candor in this case will therefore factor into the Court's statutory damages calculation, and it militates in favor of a higher statutory damages amount. *See Snyder*, 2007 WL 3143690, at *6 (increasing statutory trademark infringement damages award where the defendant continually refused to take responsibility for her actions, claiming that she had done nothing wrong).

---

[4]     As already noted above, Defendants' lack of any financial records caused Plaintiffs to seek and obtain discovery from eBay and PayPal. The records obtained are incomplete as they only cover the time period June 5, 2018 through June 22, 2020, and Defendants' counterfeiting operations began on July 26, 2016. [JPS, p. 7, ¶ Q].

### 6. Safety of Defendants' Counterfeit Products

Courts also review safety issues regarding the counterfeit products when assessing statutory damages. "Infringing a trademark is egregious and should be severely punished, but it is even more contemptible to infringe upon a trademark with goods that are potentially dangerous to the public." *See Illinois Tool Works*, 817 F. Supp. 2d at 1356.

In *Illinois Tool*, the defendants sold products that copied the appearance of the plaintiff's products, and they advertised these products as authentic merchandise for half the typical list price. *Id*. The plaintiff presented evidence that certain design flaws and defects rendered the counterfeit goods a potential safety risk to the public. Accordingly, the court found that "significant statutory damages" of $1,000,000 were warranted, despite evidence showing that the defendants' total sales of the counterfeit goods amounted to $35,455. *See id*. ("Not only does the risk inherent in such goods pose an even greater threat to the goodwill associated with the trademark registrant's mark, it also threatens the public with physical harm. Therefore, the court finds that a large statutory damages amount is appropriate.").

Similar to the counterfeit goods sold in *Illinois Tool*, the counterfeit wheel sets sold by Defendants also pose a potential risk to the public's safety. As Audi's witness testified at trial, consumers purchase automobile parts bearing Audi Trademarks expecting those products to adhere to certain quality and safety standards. [Trial Tr., pp. 24:25-25:16, 32:9-

20, 35:8-36:2]. These standards include ensuring the structural integrity of the products, and that the products satisfy governmental safety standards for use under various conditions (i.e., higher speeds, low and high temperatures, and varying road surfaces). *Id.*; [ECF No. 66-14, ¶¶ 7, 8 (Decl. of Trowbridge)].

Audi itself has seen safety issues with infringing and counterfeit wheels masquerading as genuine by using the AUDI® trademark. For example, Audi's witness testified that a dealer showed Audi photos of a counterfeit wheel that, under normal operation, collapsed under the pressure of the car. [Trial Tr., pp. 35:11-36:2). In terms of the counterfeit wheel set sold to Audi in this case, the investigator determined that the wheel cap did not properly fit the wheel -- a design flaw that could lead to the wheel cap coming detached while driving, therefore making the wheel set a potential safety hazard. [Trial Tr., pp. 40:24-41:11].

Selling counterfeit wheel sets that fail to meet industry and governmental standards -- and are untested by Audi to ensure their quality -- pose a significant risk to public safety by placing potentially unsound automobile parts on the streets. Indeed, the counterfeit products are difficult to distinguish from genuine products, which are subject to testing and regulatory standards. Therefore, the risk to the public safety posed by the counterfeit wheel set at issue here further supports a larger statutory damages award to deter future infringers from selling counterfeit automotive goods that may pose a safety risk to the public. *See Illinois Tool Works*, 817 F. Supp. 2d at 1356 ("[A] significant statutory

damages award is warranted" where defendants marketed and sold counterfeit items that posed a risk to public safety).

     b.  <u>Damages Calculation</u>

Based on the foregoing, Plaintiffs seek monetary relief from the Court for Defendants' willful trademark infringement and counterfeiting of (1) the AUDI RINGS® trademarks and (2) the AUDI® trademarks, in the form of statutory damages under 15 U.S.C. § 1117(c). After careful consideration of the nature of Defendants' willfully infringing acts, the record evidence, and relevant case law, the Court determines Plaintiffs are entitled to receive $609,227.10 in statutory damages for Defendants' willful trademark infringement and counterfeiting. The damages award is supported by the facts and evidence of the case and serves as a meaningful deterrent to Defendants and other potential future infringers from violating Audi's trademark rights.

The Court uses the following calculation[5] to determine statutory damages:

First, it is uncontested that Defendants made infringing sales of 27 counterfeit "Audi" wheel sets via eBay, based on limited sales data obtained from PayPal, which serves as an appropriate base for the damages calculation, totaling $40,615.14. [JPS, pp. 7-8, ¶ R]. This amount is the proper baseline considering the sale listings are the minimum example of Defendants' misuse of Audi's registered trademarks under the Lanham Act.

---

[5]    *See, e.g., Abercrombie*, 2009 WL 10668408, at *2 (using a similar formula to determine statutory damages).

*See* 15 U.S.C. § 1114 (counterfeiting includes "the sale, offering for sale, distribution, or advertising").

Second, the amount is then **trebled** for Defendants' willful conduct and **doubled** for deterrence, resulting in a total of $243,690.84.[6]

Third, due to the harm to Audi's reputation and goodwill caused by Defendants' willful infringement, and due to the fact that Defendants offered their counterfeit products to a "virtually limitless number of customers" via the Internet, the Court increases the amount by 25%, for a total of $304,613.55 per mark.[7]

Finally, Defendants infringed *two* separate Audi Trademarks through the sale of the Audi wheel rim sets. Thus, the total amount of statutory damages Plaintiffs are entitled to recover for Defendants' willful trademark infringement and counterfeiting is $609,227.10.

This amount fairly achieves the statutory goals of compensation, punishment, and deterrence, and is just under 15 U.S.C. § 1117(c). *See* Joint Statement on Trademark Counterfeiting Legislation, H.R.J. Res. 648, 98th Cong., 2nd Sess., 130 Cong. Rec. H12076, H12083; *see also Sun America Corp.*, 2018 WL 7021842, at *3 (awarding plaintiff $900,000 in

---

[6]     *See, e.g., Chanel, Inc. v. besumart.com*, 240 F. Supp. 3d 1283, 1293 (S.D. Fla. 2016) (trebling baseline award for defendants' willful infringement and doubling it for purposes of deterrence); *Abercrombie*, 2009 WL 10668408, at *2 (same).

[7]     *Cf. Diane Von Furstenberg Studio*, 2007 WL 3143690, at *4; *Rolex Watch U.S.A.*, 2002 WL 596354, at *5.

statutory damages when defendants failed to produce documents relating to sales and revenue); *Abercrombie*, 2009 WL 10668408, at *2 (awarding plaintiff $2,117,400 in statutory damages when there was a lack of financial data); *PetMed Express*, 336 F. Supp. 2d at 1221 ("Given Defendants' willfulness and the fact that these marks appeared on the Internet, thereby reaching a substantial number of customers, the Court finds that a total of $800,000 . . . is a reasonable damages award."); *Automobili Lamborghini SpA v. Lamboshop, Inc.*, No. 2:07-CV00266JESSPC, 2008 WL 2743647, at *7 (M.D. Fla. June 5, 2008) ("Given Defendants' willfulness and the fact that these marks appeared for sale on the internet, thereby reaching a substantial number of customers, the Court finds that a total of $700,000 . . . is a reasonable damages award pursuant to the statute," which was based on a prior version of a statute that set maximum award at $1 million per mark opposed to the current $2 million maximum).

This award also reflects the fact that Plaintiff was able to prove (as opposed to obtaining a stipulation from Defendants) the sale of only *one* counterfeit wheel sets.

Significant damages are justified here due to Defendants' selling of counterfeit wheels that pose a safety risk to the public, in that they are not subject to the rigorous quality and safety standards that Audi's genuine wheels are subjected to. *See Illinois Tool Works*, 817 F. Supp. 2d at 1356 (finding $1,000,000 in statutory damages for willful infringement was justified where counterfeit goods at issue posed safety hazard to public).

On the other hand, Plaintiff did not introduce any evidence that the one wheel set its investigator purchased was, in fact, defective. Thus, while there is the *potential* for a safety issue because the wheel set is not genuine and was not subject to Audi's quality and safety standards, that risk is theoretically possible, rather than being a concrete and specific risk which has occurred.

This award of $609,227.10 is substantial but is significantly less than the $974,763.36 award suggested by Plaintiff. [The amount awarded is 62.5% of the amount requested].

    c.   <u>Plaintiffs Are Entitled to Total Profits for Defendants' Patent Infringement</u>

Under the Patent Act, Plaintiffs are entitled to recover the total profit resulting from the sales of Defendants' accused counterfeit products, for Defendants' willful infringement of the '028 patent. 35 U.S.C. § 289; *see Sel-o-Rak Corp. v. Henry Hanger & Display Fixture Corp. of Am.*, 159 F. Supp. 769, 776 (S.D. Fla. 1958) ("35 U.S.C. § 289 makes the total profits of the infringer one of the measures of damages in design patent cases."); *see also Progressive Int'l Corp. v. AMGTM LLC*, No. C17-448 RAJ, 2018 WL 4091694, at *4-5 (W.D. Wash. Aug. 21, 2018) (granting summary judgment of design patent infringement and awarding the plaintiff $192,950 in net profits from the defendant's sales of the accused product).

From the parties' joint stipulation and limited sales data obtained through third-party discovery, Plaintiffs have established that Defendants obtained gross profits of

$40,615.14 from at least 27 sales of wheel sets advertised with the Audi design. [JPS, pp. 7-8, ¶ R]. Importantly, Defendants have stipulated to the fact that all 27 sales were infringing. *See id.* (emphases added) ("PayPal records reflect 27 sales . . . reflect[ing] a gross profit of $40,615.14 . . . This number of sales represents the *minimum amount* of Defendants' gross profit for *infringing sales* of counterfeit Audi wheel sets."). Therefore, Plaintiffs are entitled to recover at least $40,615.14 in damages due to the Defendants' willful infringement of the '028 patent.

### d.   Plaintiffs Are Entitled to Recover Attorneys' Fees and Costs

Courts routinely find cases involving willful infringement "exceptional" under both the Patent Act and the Lanham Act. *See, e.g., Progressive*, 2018 WL 4091694 at *5-6 (fee award based on a finding of willful infringement); *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003) (willful infringement makes trademark case "exceptional").

Exceptional cases include those that are "malicious, fraudulent, deliberate and willful." *Abercrombie*, 2009 WL 10668408, at *3. "Attorneys' fees may be awarded regardless of whether a prevailing Lanham Act plaintiff elected to recover actual or statutory damages for infringement." *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 166 (E.D.N.Y. 2016) (citing *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 111 (2d Cir. 2012) (stating award of attorneys' fees "is available under section 1117(a) in 'exceptional' cases even for those plaintiffs who opt to receive

statutory damages")).

Courts apply a totality of the circumstances test when determining whether the case at hand is "exceptional." *Tobinick v. Novella*, 884 F.3d 1110, 1117 (11th Cir. 2018) (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).

Importantly, when an infringer has engaged in counterfeiting, an award of attorneys' fees is **mandated** pursuant to 15 U.S.C. § 1117(b) ("If the infringement is *intentional*, however, § 1117(b) governs: unless the court finds extenuating circumstances, treble damages and attorneys' fees are mandated."). In fact, where the district court finds willful infringement, it must explain its reasoning if it does not also find the case exceptional and award fees. *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986).[8]

Here, the Court found Defendants liable for counterfeiting on summary judgment, Defendants have stipulated to willful infringement [JPS, pp. 8-9, ¶ V], and there are no extenuating circumstances on the record that would justify Defendants' willful infringement. [ECF No. 81, pp. 25-26]. Thus, an award of attorneys' fees is mandated pursuant to 15 U.S.C. § 1117(b).

Moreover, Defendants' behavior is exactly the type of intentional, non-accidental conduct that warrants the imposition of fees. For example, Defendants knowingly used

---

[8]     The Federal Circuit reaffirmed the continuing post-*Octane* vitality of *S.C. Johnson & Son* in *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1307 (Fed. Cir. 2018).

identical marks on counterfeit products appearing to be identical to those sold by Audi, a world-famous automobile maker. [ECF No. 81, pp. 8-10, ¶¶ 9-13]; *see Playboy Enters., Inc. v. P.K. Sorren Export Co.*, 546 F. Supp. 987 (S.D. Fla. 1982) (finding defendants' conduct in deliberately arranging to obtain counterfeit goods rendered case exceptional); *Audi AG v. D'Amato*, 381 F. Supp. 2d 644, 670 (E.D. Mich. 2005) (finding case exceptional and awarding fees based "upon Defendant's willful conduct"); *see also Aetna Health Care Sys., Inc. v. Health Care Choice, Inc.*, No. 84-C-642, 1986 WL 84362, at *17 (N.D. Okla. May 15, 1986) (finding the willful adopting of a trademark constitutes an "exceptional case" under the statute).

In addition, Defendants acted in bad faith during the litigation. Their actions include asserting they were not the owners of the oemwheelsdirect eBay store -- despite Mr. Varona's personal information being attached to the store as was later revealed through third-party discovery -- and submitting a sham affidavit to the Court, under the penalty of perjury. [JPS, pp. 8-9, ¶ V]. Further, Defendants made several false statements under oath. Finally, Defendants took frivolous and/or questionable positions, including the Rule 59 new trial motion submitted post-trial, causing Plaintiffs to expend unnecessary costs in relation to this litigation. *See, e.g.*, ECF No. 90.

Plaintiffs are therefore entitled to recover their attorney's fees for Defendants' willful infringement and counterfeiting. *See Sara Lee Corp.*, 36 F. Supp. 2d at 170 (awarding fees and reasoning "the sort of misconduct that supports an attorney fees award includes

not only willful infringement, but also willful defiance and protraction of judicial processes attempting to stop the illegalities").

Plaintiffs are also entitled to recover "the costs of the action" pursuant to 15 U.S.C. § 1117(a)(3). Costs include "expert witnesses, paralegals, case assistants, law clerks, secretarial overtime, travel expenses, long distance telephone calls, and any other item that an attorney would typically bill separately." 6 *Callmann on Unfair Comp., Tr. & Mono.* § 23:69 (4th ed.) (2020).

"To recover costs under the Lanham Act . . . a plaintiff need not establish that the alleged infringer acted maliciously, fraudulently, deliberately, or willfully"; rather, the award lies within the discretion of the Court and is determined by equitable principals. *See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1205 (11th Cir. 2001) (upholding award of costs "in the absence of any evidence that would warrant a finding that the balance of equities necessarily tipped in the favor of Techsplosion").

Given the fact that Defendants knowingly and willfully committed trademark infringement and counterfeiting, Plaintiffs are entitled to recover both attorney's fees and costs. Plaintiffs *estimate* that they have incurred approximately $509,695.53 in attorneys' fees and costs to date. This substantial amount was incurred because, at least in large part, of Defendants' own litigation misconduct, which forced Plaintiffs to repeatedly oppose questionable motions and spend substantial time during the discovery process due to Defendants' lack of cooperation and misstatements. Accordingly, Defendants will

be held liable for the full amount of Plaintiffs' reasonable attorneys' fees and costs as authorized by statute.

The Court will first give the parties the opportunity to agree on the amount of reasonable attorney's fees and costs. Plaintiffs' counsel shall provide defense counsel with its attorney's fees bills, including documents reflecting costs, within ten days of this Order.[9] The parties will then have seven days to agree on the amounts. If an agreement is not reached, then Plaintiffs shall, within ten days of the expiration of the first seven-day deadline, file a motion for attorney's fees and costs, with a supporting memorandum of law. Defendants will have ten days to file an opposition response.  No reply will be permitted absent further court order.

d. <u>Defendant Andy Varona Is Personally Liable for Defendants' Willful Infringement</u>

An individual defendant will be held personally liable for trademark infringement if, through a corporation, the defendant himself actively and knowingly caused the infringement. *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (citations omitted) ("Obviously if there was an infringement by the corporation,

---

[9]      Plaintiffs' estimated attorney's fees and costs is a substantial number. Plaintiffs shall carefully scour their attorney's fees bills and costs records in an attempt to seek reimbursement of only fees reasonably incurred. This means counsel should eliminate duplicative time, time not spent efficiently and time which does not reflect good billing judgment. Plaintiffs' counsel should **err on the side of caution** when assessing whether a particular time entry is appropriate and whether a portion of the fees requested should be voluntarily discounted in order to achieve sound billing judgment.

this infringement was caused by some one or more persons either officers or employees of the corporation who caused the acts to be done.").

The facts here support holding Defendant Andy Varona personally liable for infringing upon Audi's Trademarks because he actively and knowingly caused the infringement as the sole corporate officer and employee of Defendant Verotec Wheels, Inc. *See id.*

First, Mr. Varona is the President, CEO, and sole Officer of Verotec Wheels. [JPS, p. 8, ¶¶ S-T]. Second, Mr. Varona purchased the counterfeit goods, advertised the goods on eBay, and admittedly wrote the descriptions for the goods. [ECF No. 81, p. 4]. Finally, Mr. Varona owns and operates the oemwheelsdirect website from which the goods were sold. [JPS, pp. 5, 8, ¶¶ H-I, S-U]. Thus, it is clear that Defendant Andy Varona himself personally, actively, and knowingly used Audi's Trademarks without authorization, and he is the driving force responsible for the infringement at issue here. *See Chanel*, 931 F.2d at 1477. Therefore, Defendant Andy Varona should be held personally liable for the acts of his corporation, Defendant Verotec Wheels, Inc. *See id.*

## IV.     Conclusion

In light of the Court's determinations above, judgment will be entered in Plaintiffs' favor on all Counts stated in its Verified Amended Complaint, and against Defendants Andy Varona and Verotec Wheels, Inc. on all Counts in its Counterclaims.

The Court finds Defendants are liable for $609,227.10 in damages for willful

trademark infringement and counterfeiting.

The Court further finds that Defendants are liable for $40,615.14 in damages for infringing Audi's '028 patent.

Finally, the Court finds Defendants are liable for Plaintiffs' reasonable attorney's fees and costs, to be fully determined at the conclusion of this action (and after the parties first try to agree on the amount of attorney's fees, costs, and/or both).

**DONE and ORDERED** in Chambers, at Miami, Florida, on May 18, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All counsel of record